Filed 1/19/23  In re A.W. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.M.,<br><br>        Defendant and Appellant. | A165112<br><br>(Napa County Super. Ct. No. 20JD000022) |

J.M. (Mother) appeals from the order terminating her parental rights to her son, A.W. (Minor), pursuant to Welfare and Institutions Code section 366.26.[1]  Mother contends: (1) the juvenile court abused its discretion by denying her *Marsden*[2] motion; and (2) the court and the Napa County Health and Human Services, Child Welfare Services Department (Department) failed to comply with the inquiry provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq. (ICWA)).  We find no merit in

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

1

Mother's argument concerning the denial of her *Marsden* motion. But we find merit in her claim that the ICWA inquiry in this case was deficient, and so we will conditionally reverse the order terminating parental rights and remand the matter for full compliance with the inquiry provisions of ICWA.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Detention, Jurisdiction, and Disposition

The Department filed a dependency petition on March 12, 2020, alleging M.W. (Father) put then nine-year-old Minor at great risk of serious physical harm or death (§ 300, subd. (a)) by manufacturing illegal drugs—namely, Butane Honey Oil—while Minor was at home. The petition alleged Minor was in an adjacent room when an explosion occurred that caused serious damage to the bathroom and severe burns to Father. With regard to Mother, the Department alleged she placed Minor at substantial risk of harm (§ 300, subd. (b)), as she was aware of Father's drug lab, his drug use, and the explosion, but failed to take protective action. As to both parents, the petition alleged they have drug problems that prevent them from properly parenting Minor, and they have a significant history with child welfare services and failed to reunify with other children from other partners due to substance abuse and neglect. The juvenile court detained Minor on March 13, 2020.

In its jurisdiction and disposition report, the Department reported it made numerous unsuccessful attempts to contact Father, but it spoke to Mother who admitted using illegal substances for the last 27 years. Mother asserted she was high every day for the last ten years until Minor was removed, but she felt she did not have a problem staying sober, and does not need support to stay sober. Mother relayed that Father had full custody of Minor, but they co-parented and she saw Minor every day. There were many

times when she felt Father was not properly caring for Minor but she never stepped in or tried to get custody of Minor because she was high. She did not understand her role in Minor's removal as she was not present during Father's drug lab incident, even though she agreed her substance use prevented her from keeping her son safe when Father was not providing appropriate care. She saw Father with butane tanks, but thought he was " 'doing it at a friend's house.' " She stated what happened at his drug lab was a " 'shitty situation but not an explosion' " since there were walls left standing. According to concerned family members, Mother knew about Father's illegal activities. The Department recommended the court bypass reunification services for both parents. The bypass recommendation as to Mother was based on her failure to reunify with another child (§ 361.5, subd. (b)(10)).

Following a contested jurisdiction and disposition hearing in May 2020, the juvenile court found Minor is a child described by section 300, subdivisions (a) and (b). The court adjudged Minor a dependent child and bypassed reunification services for Father, but ordered services for Mother and her compliance with a specific reunification plan.

## B. The Six- and Twelve-Month Review Hearings

Prior to the six-month review hearing, the Department reported that Mother was not in compliance with numerous portions of her reunification plan. For example, she had not obtained stable housing and was living in hotels and in her vehicle. She had not attended appointments with the Department social worker, had not maintained her sobriety or developed a plan for doing so, and had not participated in therapy. The Department had no contact with Father, who had an active warrant. At the six-month review hearing on November 10, 2020, the court ordered Mother to comply with the

3

court-ordered reunification plan and advised that failure to do so could result in termination of services.

A 12-month review hearing was set for May 13, 2021. Prior to the hearing, the Department filed a report recommending termination of reunification services for Mother. The report indicated the Department made contact with Father. As for Mother, she still was not in compliance with significant portions of her reunification plan, e.g., she had not obtained stable housing, she was using drugs and got fired from her job, she inconsistently participated in drug treatment, she had not participated in therapy, and she had not progressed to unsupervised visits with Minor. In April 2021, Mother married someone who was recently released from custody and has substance abuse issues.

The report also noted Minor was engaging in concerning behavior in his kin caregiver's house,[3] such as defiance, aggression, and lack of hygiene and impulse control. The caregiver reported Minor's difficulty in the home partially stemmed from Mother setting unrealistic expectations about Minor returning to her care. Minor also had minimal rules while living with Father, and it was likely difficult for him to transition to a home with more structure. The caregiver was unwilling to adopt Minor.

At the scheduled 12-month hearing on May 13, 2021, Mother appeared in court with counsel and requested a contested hearing, which the court set for June 10, 2021 in courtroom C. At a readiness conference on June 8 in courtroom C, with Mother present, the contested hearing was continued to June 24, 2021 in courtroom C with a readiness conference on June 22 in the same courtroom. Mother and Father both appeared at the June 22 readiness

---

[3] Minor was living in the home of his paternal aunt and paternal step-uncle.

4

conference. At Mother's request, the contested hearing was re-set for July 8, 2021 with a readiness conference on July 6.

On June 29, 2021, the court heard a request for Minor to travel with his resource family. Mother was not present at this hearing, which took place in courtroom C, though her attorney said she told Mother about the hearing and expected her to appear. At the hearing, county counsel asked the court to reschedule the contest. The court rescheduled the contested hearing for July 20, 2021 in courtroom C.

On July 15, 2021, the court held a readiness conference in Department 2. Mother again did not appear. When asked to confirm the July 20 date for the contested hearing, Mother's counsel expressed concern: "I'm a little bit worried, your Honor. I have lost, just recently, contact with my client. I got not too long ago additional discovery from the social worker that indicates she has not been participating or in contact. I guess I can confirm it and try to reach her and make sure she shows for her contest. I just don't know what the end result is going to be." County counsel asserted she believed Mother was provided notice of that readiness conference. Ultimately, the court confirmed the July 20 date for the contested hearing in courtroom C.

On July 20, 2021, the 12-month contested review hearing took place in courtroom C. Mother was not present. Mother's counsel explained that after Mother failed to appear at the readiness conference, she called Mother and reminded her of the date, and expected her to be there based on their conversation. County counsel indicated the Department had lost contact with Mother "for quite some time." When asked if the parties wanted to present any additional evidence, Mother's counsel said she had none, but knew Mother would want to testify if she were present. The Department and

5

counsel for Minor objected when Mother's counsel requested a continuance, and the court denied the request because no good cause was shown and it would not be in Minor's best interests.

Ultimately, the parties submitted on the Department's reports without argument. The court terminated Mother's reunification services and set the matter for a section 366.26 hearing. In its orders, the court found, by clear and convincing evidence, that Mother failed to participate regularly in and make substantive progress in the court-ordered treatment plan, and this was prima facie evidence that returning custody to Mother would be detrimental to Minor.

## C. Proceedings Leading Up to the Section 366.26 Hearing, including the April 12, 2022 *Marsden* hearing

On July 30, 2021, Mother filed a notice of intent to file a writ petition to challenge the court's order setting the section 366.26 hearing, but the petition was eventually dismissed as abandoned because Mother did not file a writ petition.

On October 7, 2021, the Department filed a request to modify a court order pursuant to section 388, seeking to change Mother's visits to supervised visits once per month and to reduce phone calls to supervised calls once per week. Accompanying the request was a report stating that contact with Mother causes Minor anxiety and confusion and prevents him from bonding with his resource family. More specifically, Mother was aggressive and negative towards caregivers, called caregivers nonstop, sent negative text messages, and consistently tried to dictate Minor's care. This caused two prior caregivers to be unwilling to provide permanency for Minor. The current caregiver was interested in providing Minor a permanent home, but needed the Department's support to create boundaries with Mother. Mother's negative behavior escalated after her services were terminated: she

6

was making demands regarding caregiving decisions, visitation, and phone calls, and yelling at the current caregiver. She also told Minor he did not need to listen to his caregiver or talk to his social worker. She spoke negatively about the Department and made false promises to Minor.

On October 14, 2021, the court heard the Department's section 388 request to reduce Mother's contact with Minor. The Department also indicated it needed to continue the section 366.26 hearing to find another placement for Minor, as Minor's caregiver was no longer willing to adopt him because of the poor relationship with Mother. Mother testified and essentially denied all allegations about her behavior. The court found there was clear and convincing evidence to change the visitation orders as requested by the Department and continued the section 366.26 hearing to March 2022.

In March 2022, Mother and Father requested a contested section 366.26 hearing, which the court set for April 19, 2022. At the April 12 readiness conference, Mother requested a one-month continuance for a bonding study. Both parents indicated they would be asking the court to make guardianship the permanent plan. After the court denied Mother's requested continuance, Mother made a *Marsden* motion. The following is a summary of the in camera hearing on the matter.

Mother complained that her "appeal" of the termination of her reunification services was not correctly filed and so did not get heard. She denied missing the July 20, 2021, court date for the 12-month contested hearing, saying she was just across the street in the wrong courthouse because nobody had told her the courthouse location had changed. Claiming her counsel said there was not "enough evidence" to ask for reunification, Mother said she disagreed. In response, Mother's counsel explained the

"appeal" that Mother wanted but which was not filed would have been a writ petition to potentially challenge the termination of services. But because Mother's failure to appear at the hearing due to her claimed confusion about the time and place of the hearing was information that was outside of the record, the issue could not be raised via writ but would have to be raised on appeal. Mother responded: "My issues are everything that's been going on. And I'm not understanding why I have to wait until after they terminate my rights to be able to say something."

The court denied the *Marsden* motion, finding counsel was providing competent and effective representation. With regard to the issue of counsel's failure to file a writ petition, the court stated: "Regarding the writ and the appeal issue, unfortunately, that's the way the law is written, and so the issues that you might want to raise up will have to be taken up on an appeal once the case is at a different stage." The court indicated Mother was free to hire new counsel and bring them into the case.

**D.  The Section 366.26 Report and Hearing**

The Department filed reports in advance of the section 366.26 hearing recommending that the court terminate both parents' parental rights and select adoption as Minor's permanent plan. The Department reported that Minor's behavioral issues had subsided and that he stabilized in his placement after the court decreased his contact with Mother. Also, the prospective adoptive parent had requested to adopt Minor. Although Minor wanted to reunify with Mother, if that was not possible, then he wanted his current caregiver to adopt him.

In an addendum report, the Department noted ongoing concerns with Mother, including that she had no employment, stable housing, or transportation, and that she took no responsibility for Minor's detention.

Mother placed the blame solely on Father, despite acknowledging that Minor needed better care and her failure to step in because of drug use. Father believed that Minor is not safe with Mother, voicing concerns about Mother's association with criminal offenders and her own violent behavior.

The section 366.26 hearing took place on April 19, 2022. Father appeared, withdrew his contest, and submitted to the termination of his parental rights. Mother maintained her contest. Minor—who was then 11 years old—testified at the hearing. In short, he wanted to be adopted and also to continue seeing Mother. When asked how he felt about guardianship as an option, he indicated that he would both want that and not want that, and it was difficult to express how he felt. Mother's counsel asked if, maybe, in "a year, or two, three, four years from now you might go home, how do you feel?" Minor responded, "I feel happy."

Mother testified about her bond with Minor. She denied ever interfering with his prior placements and indicated she would not interfere with Minor's caregiver if the court granted a guardianship. She asserted that she last used illegal substances two months prior to the hearing, that she stopped by herself, and that she attends Narcotics Anonymous meetings. Mother said she was on step one, but she had no sponsor and could not explain what step one was.

Rocio Diaz-Lara, the Department social worker, testified she had been assigned to the case since August 2021. Diaz-Lara believed adoption was in Minor's best interest because Minor wanted to be adopted and because he likes his prospective parent and the other children in the home. Adoption was also a better option because Minor would have permanency and not grow up in the system. Diaz-Lara felt guardianship would not be in Minor's best interest because it would jeopardize permanency, as the Department would

9

have to find Minor a new home or Minor would age out of the system. Diaz-Lara indicated it is very common for children to be conflicted about wanting to be adopted versus living with a parent.

Ultimately, the court found that no exception to the termination of parental rights applied, and it terminated the parental rights of both Father and Mother. Mother filed a notice of appeal.

**DISCUSSION**

## A. *Marsden*

Mother contends the juvenile court abused its discretion by denying her April 12, 2022 *Marsden* motion. We disagree.

Parents facing termination of parental rights have a right to competent counsel. (*In re A.R.* (2021) 11 Cal.5th 234, 245–246, citing § 317.5, subd. (a).) " 'Juvenile courts, relying on the *Marsden* model, have permitted . . . parents . . . to air their complaints about appointed counsel and request new counsel be appointed.' " (*In re A.H.* (2013) 218 Cal.App.4th 337, 342, fn. 5.) When a defendant seeks to substitute appointed counsel pursuant to *Marsden*, " ' "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.] 'A trial court should grant a defendant's *Marsden* motion only when the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." ' [Citation.] 'We review the denial of a *Marsden* motion for abuse of discretion.' [Citation.] 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to

10

replace counsel would substantially impair the defendant's right to assistance of counsel." ' " (*People v. Streeter* (2012) 54 Cal.4th 205, 230 (*Streeter*).)

At the *Marsden* hearing, Mother argued, in essence, that her attorney failed to file an appellate challenge—a writ or an appeal—to the outcome of the 12-month review hearing and, due to counsel's incompetence, reunification services were discontinued. Setting aside whether counsel was mistaken in stating that evidence outside of the record regarding Mother's failure to appear at the 12-month review hearing could be presented in this appeal, Mother made no showing at the *Marsden* hearing that there was any evidence that could have or would have caused the juvenile court to rethink its decision terminating services. Mother presented nothing that contradicted the Department's status review report for the 12-month review hearing, which established that she made little or no progress in major areas of her reunification plan. For example, she failed to stay sober, to actively participate in substance abuse treatment until around March 2021, and to submit to random drug tests. She also failed to participate in mental health therapy and did not consistently participate in parenting classes. Mother had no stable housing and sometimes slept in her vehicle, had no employment, and had failed to avail herself of community resources to secure a place to live or pay her bills or obtain food. Additionally, she failed to show she could prioritize Minor's needs by continuing to do things like telling him incorrect information about reunification. The Department's report further indicated that it remained unclear if Mother even understood the impact of her drug addiction on Minor and whether she could prioritize Minor's needs. After the hearing, the court found, by clear and convincing evidence, that Mother failed to participate regularly in and make substantive progress in the court ordered treatment plan.

And the addendum to the report prepared for the section 366.26 hearing indicated that even at the time of the section 366.26 hearing in April 2022, the Department still had significant ongoing concerns regarding Mother. For instance, she continued to take no responsibility for Minor's detention; she had no employment, housing or transportation; she failed to develop a support network and failed to work on her sobriety; and she stopped attending substance abuse services once services were terminated without successfully completing them. The Department also reported that Minor's behavioral issues subsided and that he stabilized in his placement after the court decreased his contact with Mother. Notably, Mother does not challenge the court's decision denying her request for a continuance of the section 366.26 hearing so a bonding study could be conducted. Nor does she challenge the juvenile court's ultimate decision to order adoption as the permanent plan or its refusal to establish a guardianship.

On this record, we conclude the court did not abuse its discretion in denying Mother's *Marsden* motion. Specifically, Mother made no showing, substantial or otherwise, that the failure to order substitution of counsel would likely result in constitutionally inadequate representation. (*Streeter*, *supra*, 54 Cal.4th at p. 230.)

On a final note, we observe that Mother makes an IAC claim as well, arguing that her attorney performed deficiently by not filing a section 388 petition to present evidence showing that Mother was in the wrong courthouse at the time of the 12-month review hearing. In her reply brief, she clarifies that this IAC claim is "not a stand-alone argument which requests any form of relief"; rather, she wants this court to consider her IAC claim in evaluating prejudice from the denial of her *Marsden* motion. But, as we find no abuse of discretion in the denial of Mother's *Marsden* motion, we

12

need not evaluate prejudice arising from the erroneous denial of such a motion.

In sum, we reject Mother's claim that the juvenile court abused its discretion in denying her *Marsden* motion.

## B. ICWA

Mother makes two ICWA contentions, which we address in turn. First, she argues the juvenile court erred by failing to make findings as to the adequacy of the Department's inquiry and whether Minor is an Indian child. This lacks merit.

A juvenile court must make findings as to the applicability of ICWA and such findings "may be either express or implied." (*In re Asia L.* (2003) 107 Cal.App.4th 498, 506.) When they are implied, the record must "reflect that the court considered the issue and decided whether ICWA applies." (*Ibid.*) Here, the record reflects the court's consideration of the issue: it found that there was reason to believe ICWA may apply, that the department provided proper notice under ICWA, that there was no reason to know Minor is an Indian child, and it therefore indicated it would proceed as though ICWA did not apply. As such, we reject the claim.

Next, though Mother does not complain about lack of ICWA inquiry into *her* ancestry, she contends the Department failed to fulfill its duty of inquiry under ICWA by failing to ask Father or any other paternal relatives about their potential Native American ancestry. In response, the Department does not argue that it satisfied its duty of inquiry as to Father or paternal relatives. Instead, the Department argues that any error was harmless. We examine this claim in more detail below.

13

## 1. *Additional Facts*

### (a) *Summary of the Department's notice and inquiry efforts*

At the outset of this case, the detention report indicated the Department had no contact with Father, who was in hiding and actively being sought by law enforcement. The report, however, indicated the Department had spoken to Mother and her adult daughter, who both denied any Indian ancestry on either side of the family. At the March 2020 detention hearing, Father was absent but Mother was present and asserted she had Native American descent, specifically naming the Winnebago tribe in Wisconsin. Mother asserted neither she nor the Minor was enrolled, but her great-grandfather (W.V.L.)—the father of her grandmother (S.V.L.)—was enrolled in the tribe. The jurisdiction and disposition report noted the maternal grandmother provided the name of her mother who may have had Native American ancestry.

In March 2020, the Department served ICWA-030, the Judicial Council Form Notice of Child Custody Proceeding for Indian Child (hereafter ICWA notice) by certified mail to the Secretary of the United States Department of the Interior, to the Sacramento Area Director of the Bureau of Indian Affairs, and to representatives of multiple tribes.[4] The ICWA notice included Minor's name, birthdate, and place of birth; Mother's legal and maiden names,

---

[4] The following tribes were noticed: the Assiniboine/Sioux Tribes of the Fort Peck Reservation, Crow Creek Sioux Tribe, Cheyenne River Sioux Tribe, Flandreau Santee Sioux Tribe, Lower Brule Sioux Tribe, Oglala Sioux Tribe, Rosebud Sioux Tribe, Shakopee Mdewakanton Sioux Community of Minnesota, Lower Sioux Indian Community of Minnesota, Prairie Island Indian Community, Santee Sioux Nation, Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, Spirit Lake Tribe, Upper Sioux Community of Minnesota, Winnebago Tribe of Nebraska, Standing Rock Sioux Tribe, and Yankton Sioux Tribe.

aliases, current and former addresses, birthdate, purported tribes or bands and locations, purported tribal membership, and the fact that Mother is not deceased; Minor's maternal grandmother K.J.'s name and maiden name, alias, current address, her date and place of birth and the fact that K.J. is not deceased; Minor's maternal great-grandmother S.V.L.'s name; Minor's great-great-great-grandfather W.V.L.'s name; and the names and birth dates of Minor's half siblings. The ICWA notice also included Father's name, current and former addresses, birthdate, and the fact that he is not deceased.[5]

Thereafter, the Department filed ICWA compliance documents showing receipt of the ICWA notices and responses from the tribes.

At the 6-month review hearing, the court found that there was reason to believe ICWA may apply, but that the Department noticed multiple organizations and tribes, that all recipients but the Oglala Sioux Tribe and BIA had responded, and there was no evidence Minor was a member or eligible for membership in a tribe. Finding no reason to know that Minor was an Indian child, the court indicated it would proceed as if ICWA did not apply. This remained the order of the court at subsequent hearings.

### (b) The Department's inquiry of Father and his participation in the dependency proceedings

For the first half of this case, Father was neither present at the hearings nor in contact with the Department. Father did not attend the May 2020 jurisdiction and disposition hearing or the 6-month review hearing in November 2020.

---

[5] Over the course of the case, the Department provided additional ICWA notices to the tribes; the information in these notices remained largely unchanged from the initial notice. We observe, however, that the ICWA notices sent only to the Oglala Sioux Tribe for 12-month review hearing and subsequent hearings did not include Minor's maternal great-grandmother S.V.L.'s name, as it had in prior notices.

15

Father surfaced later in the case, however. Prior to the 12-month review hearing, the Department indicated it obtained updated contact information for Father and spoke to him in April 2021 while he was out on bail in a criminal matter. But the record contains no indication that the Department contacted Father to make an inquiry under ICWA. Although Father appeared via Zoom at the 12-month review hearing in May 2021, the Department did not ask him about ICWA at that hearing.

In its section 366.26 report, the Department indicated that Father was in a residential program as part of his probation, that Father had "checked-in" with the Department about Minor once in February 2022, and that he and Mother visited with Minor in January 2022. An addendum report filed in April 2022 showed Father had a phone call with the Department in late March 2022 and went to the Department's office in April 2022. But again, there is no indication in these reports that the Department asked Father about possible Native American ancestry. And though Father appeared at the contested section 366.26 hearing in April 2022, as well as the April 12, 2022 readiness conference and the March 29, 2022 hearing when Father initially requested a contested section 366.26 hearing, the record of those hearings does not reflect the Department asked him about possible Native American ancestry.

### 2. Analysis

"ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards a state court must follow before removing an Indian child from his or her family." (*In re T.G.* (2020) 58 Cal.App.5th 275, 287.) In addition to federal law, California law implements ICWA. (*In re Isaiah* (2016) 1 Cal.5th 1, 8–9.)

16

Presently, section 224.2 sets forth the state law requirements for ICWA inquiry. It provides that the court and county welfare department have an affirmative and continuing duty to inquire whether a child for whom a petition under section 300 may be or has been filed is or may be an Indian child. (§ 224.2, subd. (a).) " 'The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry.' " (*In re K.H.* (2022) 84 Cal.App.5th 566, 597 (*K.H.*).) " 'The duty of initial inquiry applies in every dependency proceeding. [Citation.] Federal regulations require state courts to ask each participant "at the commencement" of a child custody proceeding "whether the participant knows or has reason to know that the child is an Indian child." ' " (*Ibid.*) State law provides: "*At the first appearance in court of each party*, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child." (§ 224.2, subd. (c), italics added.)

After an initial inquiry, if a social worker has "reason to believe" an Indian child is involved in a proceeding but does not have enough information to determine that there is reason to know the child is an Indian child, then the court or social worker must make further inquiry regarding the possible Indian status of the child. (§ 224.2, subd. (e); see *id.*, subd. (e)(1) [reason to believe a child is an Indian child exists whenever the court or a social worker "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe"].) Further inquiry includes interviewing parents and extended family members to gather certain information. (§ 224.2, subd. (e)(2)(A).)

In this case, there is no dispute that the Department erroneously failed to conduct an inquiry of Father or any other paternal relatives when Father

finally surfaced in the case.[6]  Instead, the dispute centers on whether the error was harmless.  Thus, we first address the applicable standard for assessing prejudice.

Recently, courts have employed varying standards when assessing deficiencies in the duty of inquiry, holding for instance that:  (1) deficient initial inquiry is reversible per se (*In re Y.W.* (2021) 70 Cal.App.5th 542, 556; see *K.H.*, *supra*, 84 Cal.App.5th at pp. 617–618 [characterizing these cases as "involv[ing] records so undeveloped that the inadequacy of the inquiry is readily apparent and there simply is no basis on which to find substantial evidence would support a contrary conclusion"]); (2) deficient inquiry requires reversal where the record reveals there was readily obtainable information that was likely to bear meaningfully on whether the child was an Indian child (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744 (*Benjamin M.*)); (3) deficient inquiry is harmless unless the "record"—including a proffer an appealing parent makes on appeal—contains information suggesting a reason to believe a child is an Indian child (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 779 (*Dezi C.*), review granted Sept. 21, 2022, S275578); and (4) deficient inquiry requires reversal if the record below demonstrates an affirmative assertion of Indian heritage or an appellant makes an offer of proof or other affirmative assertion of Indian heritage on appeal.  (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1069.)

Here, the Department argues we should apply the standard adopted by the *A.C.* court because it promotes finality while serving the purposes of

---

[6]     Mother argues about the failure to conduct an inquiry of "other paternal relative[s]" but does not specify any such paternal relatives other than the paternal aunt and her spouse, with whom Minor was placed with for a period of time.

ICWA. Mother appears to contend we should apply any standard other than the *A.C.* standard, noting it has been criticized.

Case law has indeed criticized the *A.C.* approach, noting that it would routinize consideration of new evidence on appeal, which is generally disfavored; that it shifts the burden of investigation onto parents in dependency proceedings; and that it does not sufficiently serve the interests of the Native American tribes because prejudicially deficient inquiries will go uncorrected if an appealing parent is unwilling or unable to make a meaningful proffer on appeal. (*K.H.*, *supra*, 84 Cal.App.5th at pp. 612–614, and cases cited.) These criticisms are well taken and so we move on to examine the error under the other standards. Ultimately, we need not choose among the remaining standards because—under any of them—the error here cannot be said to be harmless.

Under the reversible per se approach, reversal of course would be warranted. Next, under the approach in *Benjamin M.*, the Department's failure to conduct an inquiry of Father or other paternal relatives was not harmless. Father was available and, ostensibly, so was the paternal aunt in whose home Minor lived. Their responses would have borne meaningful information, regardless of the outcome of the inquiry. (*Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 744–745.) The error also would not be harmless under the approach in *Dezi C.*, which stated that "an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding. . . . To illustrate, a reviewing court would have 'reason to believe' further inquiry might lead to a different result . . . *if the record*

19

*indicates that the agency never inquired into one of the two parents' heritage at all . . . ."* (*Dezi C., supra*, 79 Cal.App.5th at p. 779, original italics and italics added.)

Finally, as Mother stresses in her reply brief, "where the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*K.H., supra*, 84 Cal.App.5th at p. 610.) Under this standard, too, the error here cannot be said to be harmless.[7]

A conditional reversal is therefore appropriate so that the Department may properly fulfill its duty of inquiry under ICWA.

## DISPOSITION

The order terminating parental rights is conditionally reversed. The juvenile court is directed to order the Department to conduct additional inquiry (§ 224.2) of Father and other available paternal relatives. If, after determining that an adequate inquiry was made consistent with the reasoning in this opinion, the court finds that ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law. If the court instead finds that ICWA does not apply, its ICWA finding shall be reinstated. In all other respects, the court's orders terminating Mother's parental rights are affirmed.

---

[7] In reaching this conclusion, we note the record indicates that Father had a prior dependency case involving another child, M.S. Unfortunately, the documents in the record concerning this prior dependency case do not inform the ICWA issue in the present case, because they do not show that Father ever previously spoke to the Department regarding potential Native American ancestry.

20

FUJISAKI, ACTING P.J.


WE CONCUR:


PETROU, J.


RODRÍGUEZ, J.


*Napa Co. HHS v. J.M.* (A165112)

21